UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MERCHANT CASH & CAPITAL LLC,

       Plaintiff,

  -against-

EDGEWOOD GROUP, LLC, et al.,

       Defendants.

14cv03497 (JGK) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:**

  This breach-of-contract action is currently before this Court for a damages inquest on a judgment entered in favor of plaintiff Merchant Cash & Capital LLC ("Plaintiff") against defendants Edgewood Group, LLC ("Edgewood Group" or "Edgewood") and William Travis Crocker ("Crocker") (collectively, "Defendants"). For the reasons that follow, I recommend that Plaintiff be awarded damages in the amount of $129,689.95 – representing $116,276.12 in contractual damages, $10,292.83 in prejudgment interest, $461.00 in costs, and $2,660.00 in attorneys' fees – plus interest at the rate of nine percent per annum running from July 31, 2014 until the date of entry of final judgment.

## BACKGROUND

### A.   Procedural History

  Plaintiff filed its Complaint in this action on May 15, 2014, seeking damages in the amount of $117,376.12 – as well as interest, costs, and attorneys' fees – as a result of Defendants' purported breach of an agreement related to the sale of future credit card receivables. (*See generally* Complaint, dated May 12, 2014 ("Compl.") (Dkt. 2).) The details of the Complaint are discussed in the following section.

Plaintiff served the Summons and Complaint on Defendants on June 4, 2014 (*see* Dkt. 4), but, to date, neither defendant has appeared in this action or otherwise communicated with this Court.  On June 26, 2014, upon Plaintiff's request, the Clerk of Court entered a default as to each defendant.  (*See* Request to Enter Default, dated June 26, 2014 (Dkt. 5); Clerk's Certificate & Notation of Default, dated June 26, 2014 (Dkts. 6 (Edgewood), 7 (Crocker)).)  Plaintiff then moved for a default judgment on July 23, 2014.  (Dkt. 11.)  By Order dated July 31, 2014, the Honorable John G. Koletl, U.S.D.J., granted Plaintiff's motion and referred the matter to me for an inquest on damages.  (Dkts. 14, 15.)

At this Court's request (*see* Dkt. 17), Plaintiff, on November 4, 2014, timely made a supplemental submission clarifying the basis for the amount of damages claimed in its motion for a default judgment (*see* Dkt. 18).  In addition, in response to this Court's Order to Show Cause, dated May 29, 2015 (Dkt. 20), Plaintiff made a timely submission clarifying the basis for this Court's subject matter jurisdiction over the current action (*see* Dkt. 21).  The contents of Plaintiff's submissions are described below.

    **B.**      **Plaintiff's Submissions to the Court**

        **1.**    **The Complaint**

According to the Complaint, Plaintiff is a Delaware limited liability company, with its principal place of business in New York, and none of its members are citizens of Virginia. (Compl. ¶¶ 1-2.)  Edgewood Group is alleged to be a Virginia limited liability company with its principal place of business in Virginia (*id.* ¶ 3), and Crocker, a resident of Virginia (*id.* ¶ 4), is alleged to be its "owner" (*id.* ¶ 5).  The Complaint lists four causes of action:  two against Edgewood Group alone, one against Crocker alone, and one against both.

As described in the Complaint, Plaintiff's claims arise out of an agreement entered into on or about June 21, 2013 (the "Agreement"), in which Edgewood Group "sold $163,726.00 of its business receivables/revenue to [Plaintiff] . . . for an upfront sum of $115,300.00."  (*Id.* ¶ 9.) Plaintiff and Edgewood Group allegedly agreed that the "business receivables/revenue" would be paid "from a percentage of [Edgewood Group's] daily revenue."  (*Id.*)  The Complaint contains no further information as to the terms of the Agreement, nor was a copy of the Agreement annexed to the Complaint.

Plaintiff's first cause of action, against Edgewood, is for breach of the Agreement. Plaintiff alleges that it "fulfilled its obligation" to make the upfront payment of $115,300.00 required under the Agreement.  (*Id.* ¶ 10.)  Plaintiff further alleges, however, that Edgewood Group "defaulted under the terms of the Agreement by breaching its representations and warranties to Plaintiff in direct violation of the Agreement."  (*Id.* ¶ 12.)  According to Plaintiff, Edgewood has been "in breach and default" since August 6, 2013.  (*Id.* ¶ 15.)  Plaintiff contends that, as a result of the breach, "[a]ny outstanding balance owed by [Edgewood Group] at the time of default became immediately due and payable."  (*Id.* ¶ 11.)  Yet Plaintiff claims that Edgewood "refused to make all payments due" (*id.* ¶ 13), leaving a "balance" of $117,376.12 as of May 12, 2014 (*id.* ¶ 14).

Plaintiff's second cause of action merely alleges that Edgewood Group "utilized the funds" provided by Plaintiff (*id.* ¶ 20), that Edgewood has "failed to pay [Plaintiff] a balance of $117,376.12" owed in accordance with the Agreement (*id.* ¶ 21), and that, as a result, Edgewood Group is "indebted to [Plaintiff] for the balance of $117,376.12," plus statutory interest as of August 6, 2013 (*id.* ¶ 22).

3

Plaintiff's third cause of action, against Crocker, alleges that Crocker "made a written unconditional personal guarantee of [Edgewood Group's] performance" under the Agreement. (*Id.* ¶ 24.)  The Complaint alleges that Edgewood Group "failed to perform under the terms and conditions of the Agreement damaging [Plaintiff] in the amount of the outstanding balance," and that, as a result, Crocker "is personally liable for the entire balance pursuant to the personal guarantee."  (*Id.* ¶ 25.)

Plaintiff's fourth cause of action, against both Edgewood Group and Crocker, is for costs and attorneys' fees pursuant to the Agreement.  (*Id.* ¶¶ 29-32.)  Plaintiff alleges that Edgewood, under the Agreement, "agree[d] to pay all costs associated with a breach and the enforcement thereof, including, but not limited to, court costs and attorneys' fees and disbursements."  (*Id.* ¶ 29.)  Plaintiff further alleges that Crocker also agreed to pay any costs, expenses, and attorneys' fees that Plaintiff incurred as a result of Edgewood Group's default.  (*Id.* ¶ 30.)

### 2. **Plaintiff's Motion for a Default Judgment**

In support of its application for a default judgment, Plaintiff submitted a declaration from its attorney, Christopher R. Murray, Esq. ("Murray"), including further factual allegations. (Declaration in Support of a Default Judgment, dated July 23, 2014 ("Murray Default Decl.") (Dkt. 12).)  Murray's declaration also annexes a copy of the Agreement, which in fact consists of two parts:  a "Merchant Agreement" (Merchant Agreement, included in Ex. D to Murray Default Decl. (Dkt. 12-4), at 2-7), and an addendum relating to the "MCC Cash Advance/Fixed ACH Program" (Letter agreement regarding "MCC Cash Advance/Fixed ACH Program," dated Apr. 15, 2013 ("ACH Agreement"), included in Ex. D to Murray Default Decl. (Dkt. 12-4), at 8-12).

a.    **Murray's Declaration in Support of Default Judgment**

In his declaration, Murray states, as alleged in the Complaint, that "Edgewood sold $163,726.00 of its future sales receivables to be paid as a percentage of its daily sales receivables to [Plaintiff] for the upfront sum of $115,300.00." (Murray Default Decl. ¶ 12.) He also states that, on or about July 1, 2014, Plaintiff provided Edgewood with the $115,300.00 purchase price for Edgewood's receivables. (*Id.* ¶ 19.)

Murray also lays out several terms of the Agreement that were not included in the Complaint, including that (1) "[p]ursuant to [a] Fixed ACH Program addendum, the Defendants would pay [Plaintiff] $930.26 on each business day until such time as defendant Edgewood had paid [Plaintiff] the total purchased amount of $163,726.00" (*id.* ¶ 12);[1] (2) "Edgewood agreed that it would not change the designated bank account, close the designated bank account, or use another bank account to hold its deposits or receive credit card sales receivables prior to [Plaintiff's] receipt of the total purchased amount" (*id.* ¶ 14); (3) Edgewood agreed that it would not "permit any necessary licenses or permits to lapse" (*id.* ¶ 16); and (4) Crocker "agreed that liability for a breach of the agreement and/or the representations and warranties made by Edgewood [G]roup would result in joint and several liability for all damages" (*id.* ¶ 18).

In terms of Edgewood's breach, Murray states that Edgewood "made some payments under the [A]greement until August 6, 2013, when it began maintaining insufficient funds in the designated bank account." (*Id.* ¶ 20.) He also states that, on September 23, 2013, Plaintiff contacted Crocker, who "admitted that Edgewood had allowed certain permits and/or licenses to lapse that were necessary for Edgewood's operation," which constituted "an admission that

---

[1] As discussed in the following section, these payments were to be made by way of automatic transfer from a designated bank account.

Edgewood breached its representations and warranties to Plaintiff." (*Id.* ¶ 22.) Murray also alleges that Edgewood "continues to operate but refuses to resume payments of the purchased receivables . . . [and] refuses to provide [Plaintiff] access to its business bank account" to obtain the purchased receivables. (*Id.* ¶ 24.) The basis for Murray's knowledge as to these facts is apparently based on his "review of the file maintained by [his] office." (*Id.* ¶ 1.) He also annexes a payment ledger, displaying the history of payments Plaintiff had received from Edgewood Group up to that point. (Murray Default Decl., Ex. E (Dkt. 12-5), at 5-19.)

### b.    The Agreement

The Merchant Agreement, annexed to Murray's declaration, is dated June 21, 2013, and signed by Crocker, on his own behalf and on Edgewood's behalf, on June 24, 2013. (Merchant Agreement, at 1.) The signature of Plaintiff's representative is undated. (*Id.* at 6.) The parties agreed that the Agreement would be governed by and construed in accordance with "the laws of the State in which the Physical Address of [Plaintiff] is located" – that is, New York – and consented to the jurisdiction of New York state and federal courts in the case of a dispute (ACH Agreement ¶ M (amending Merchant Agreement § 5.6)).[2]

### i.    Edgewood Group's Obligations

Under the Merchant Agreement, Plaintiff was entitled to "a percentage, as specified below (the 'Purchased Percentage'), of each future credit card, debit card, bank card and/or other charge card . . . receivable . . . due to [Edgewood Group] from its credit card processor until [Plaintiff]" received the "Purchased Amount," *i.e.*, $163,726.00. (Merchant Agreement, at 1.) The parties, however, did not specify a "Purchased Percentage" in the document (that is, the

---

[2] The Merchant Agreement provides, however, that any claims by Defendants against Plaintiff are subject to arbitration upon notice by any party. (Merchant Agreement § 5.10(a).)

space to identify the "Purchased Percentage" reads only "%") (*id.*), and Plaintiff has not, in any

of its submissions, identified the percentage of future receivables it purportedly purchased.

On or about the same date as Edgewood executed the Merchant Agreement, Edgewood

also, by way of the addendum to that agreement, entered into Plaintiff's "Fixed ACH Program,"[3]

in which Edgewood agreed to allow Plaintiff to initiate transfers from a designated bank account

on each business day in the amount of $930.26, until Plaintiff had received the purchased amount

of $163,726.00.[4]  (ACH Agreement ¶ B.)  Edgewood further agreed that it would deposit all of

its credit card receipts into the designated bank account (*id.* ¶ E), and that it would not close the

bank account until Plaintiff had been paid the full purchased amount (*id.* ¶ G).[5]

---

[3] Although the signatures on this document are undated, it appears that it was faxed to Plaintiff by Edgewood Group on June 24, 2013, the date Crocker signed the Merchant Agreement.

[4] This arrangement contemplates 176 payments from Edgewood Group to Plaintiff (roughly eight months' worth).

[5] It is not entirely clear to this Court what differentiates this arrangement from a loan, to which lending laws (such as usury caps) would apply.  Although the Merchant Agreement explicitly states that the transaction at issue is not a loan (*see* Merchant Agreement § 4.1 (stating that the transaction "is not intended to be, nor shall it be construed as, a loan"); *id* § 5.11 (stating that Edgewood and Crocker agree not to institute or prosecute any claim of usury, and that, in the event of a breach of this provision, they will be liable for Plaintiff's costs, including attorneys' fees)), the structure of the transaction suggests otherwise.  While the Merchant Agreement apparently contemplates the purchase of a percentage of future credit card receivables, no percentage is specified.  Instead, Edgewood Group bound itself, through the ACH Agreement, to making regular payments over the course of about eight months, until it paid the amount it had received up front, plus 42 percent more.  This arrangement looks substantially like a loan (as opposed to Plaintiff's acquisition of a portion of Edgewood's future receivables), but with an effective interest rate of over 50 percent per year.

Nevertheless, this Court cannot conclude, as a matter of law, that the transaction at issue was a loan, *see Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660, 668 (N.D. Tex. 2014) (analyzing contractual language and "attendant circumstances" in finding that transfer of credit card receivables was not a loan under Texas law, and relying, in part, on contractual language stating there were "no scheduled payments and no fixed repayment term" under the relevant agreement), and this Court also notes that usury is an affirmative defense that may be waived upon default, *see Carlone v. Lion & the Bull Films, Inc.*, 861 F. Supp. 2d 312, 319 (S.D.N.Y. 2012).  Thus, for purposes of this inquest, based on Defendants' default, this

In addition, under Section 3.1 of the Merchant Agreement, Edgewood Group specifically agreed, *inter alia*, that it would "not amend or terminate" any authorization to initiate automatic payments (Merchant Agreement § 3.1(iii)), and that it would "not change the account name, password, or other access information" of the bank account designated under the ACH Agreement without giving Plaintiff at least 10 days' prior notice (*id.* § 3.1(vi)).  Edgewood Group also made numerous additional representations, warranties, and covenants, including that, at the time it entered into the Agreement and during its term, it "possesse[d] and [was] in compliance with all permits [and] licenses . . . necessary to conduct its business" (*id.* § 3.4), and that it would "continue to conduct its business consistent with past practice" (*id.* § 3.8).[6]

The Merchant Agreement provides that, in the event of a breach of Section 3.1, Plaintiff is "entitled to, among other things, damages equal to the amount by which the cash attributable to the Purchased Amount of future credit card receivables exceeds the amount of cash received from the credit card receivables" already paid by Edgewood Group.  (*Id.* § 4.4.)

### ii.   **Crocker's Obligations**

The Merchant Agreement also contains the following guarantee by Crocker:

> In consideration of [Plaintiff] entering into this Agreement, and to induce [Plaintiff] to enter into this Agreement . . . [Crocker] personally guarantee[s] to [Plaintiff] that:  (I) all information provided by [Edgewood] to [Plaintiff] in connection with the transaction contemplated by this Agreement is true, correct, and complete, . . . [and] (III) [Edgewood] shall not breach, or do any of the acts prohibited by, Section 3.1 of this Agreement.

---

Court accepts Plaintiff's characterization of the transaction as a sale of receivables, rather than a loan.

[6] The Merchant Agreement also provides that Edgewood must use a credit card processor approved by Plaintiff, and that both Plaintiff and Edgewood "understand that the credit card processor will charge a fee or commission" as set forth in a separate agreement not before this Court.  (Merchant Agreement §§ 1.1, 1.3.)

(*Id.* at 1.)  Crocker also agreed that Plaintiff "may proceed directly against [him] without first proceeding against [Edgewood]."  (*Id.*)

### iii.   Edgewood's and Crocker's Joint Obligations

Edgewood Group and Crocker agreed that, in the event of a breach, they would be jointly and severally liable for "all liabilities, claims, losses, obligations [and] damages" related to the "collection of amounts due to [Plaintiff] [under the Agreement], including attorneys' fees and costs in any trial court or appellate court proceeding . . . ."  (*Id.* § 5.7; *see id.* at 1.)

### 3.   Plaintiff's Submission on This Inquest

On October 27, 2014, this Court requested that Plaintiff make a further submission clarifying the amount of damages it had requested in its motion for a default judgment. (Scheduling Order for a Damages Inquest, dated Oct. 27, 2014 (Dkt. 17).)  This Court specifically directed Plaintiff to clarify its contractual damages, as the amount stated in the Complaint (Compl. ¶ 14), the amount requested in the supporting declaration (Murray Default Decl. ¶ 27), and the amount indicated in the payment ledger attached to Murray's Default Declaration (*see* Dkt. 12-5, at 5) were all different.  (Dkt. 17, at 1-2.)  This Court also directed Plaintiff to substantiate the amount of attorneys' fees it was claiming, as Plaintiff had not done so in connection with its motion for a default judgment.  (*Id.* at 2.)

Plaintiff made a supplemental submission clarifying these issues on November 4, 2014. (*See generally* Declaration in Support of Plaintiff's Damages, dated Oct. 31, 2014 ("Murray Inquest Decl.") (Dkt. 18).)  With this submission, Plaintiff included a declaration from David Gallagher ("Gallagher"), Plaintiff's Director of Collections.  (Declaration of David Gallagher, dated Oct. 31, 2014 ("Gallagher Decl."), included in Ex. C to Murray Inquest Decl. (Dkt. 18-3), at 2-4.)  Gallagher states, as to Edgewood's breach, that, on August 6, 2014 [*sic*, 2013],

Edgewood breached the Agreement "by failing to remit the purchased receivables, failing to maintain positive bank balances in the designated business bank account, failing to maintain necessary licenses and/or permits, refusing to permit [Plaintiff] access to its business bank account to make the daily withdrawals and refusing to resume daily payments." (*Id.* ¶ 6.) In terms of the discrepancy in the contractual damages claimed, as noted by this Court, Gallagher states that, as of October 31, 2014, Plaintiff had, through its "exhaustive collections efforts," obtained a total of $47,449.88 from Defendants. (*Id.* ¶¶ 7, 8.) Gallagher included an updated payment ledger showing a history of Defendants' payments. (*See* Payment Ledger, included in Ex. C to Murray Inquest Decl. (Dkt. 18-3, at 5-11; Dkt. 18-4).)

### 4.   Plaintiff's Response to this Court's Order to Show Cause

On May 29, 2015, upon determining that the allegations in the Complaint, even if true, were insufficient to establish diversity jurisdiction (in that they were insufficient to establish the citizenship of any of the parties, as discussed in Section II(A), *infra*), this Court issued an Order directing Plaintiff to show cause why this Court should not recommend dismissal for lack of subject matter jurisdiction. (Order to Show Cause, dated May 29, 2015 (Dkt. 20).) On June 3, 2015, Murray submitted a declaration, made under penalty of perjury, in which he states that (1) Plaintiff's members are citizens of New York, Maryland, and Nevada; (2) Crocker is a citizen of Virginia; and (3) Crocker is Edgewood Group's sole member. (Declaration in Response to the Court's Order to Show Cause, dated June 2, 2015 ("Murray SMJ Decl.") (Dkt. 21), at ¶¶ 3-5.)

### DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Default Judgment and Damages

While "default is an admission of all well-pleaded allegations against the defaulting party," *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004), a

court is "'required to determine whether the [plaintiff's] allegations establish [the defendant's]
liability as a matter of law,'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137
(2d Cir. 2011) (alteration in original; quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir.
2009)); *accord Taizhou Zhongneng Import and Export Co. v. Koutsobinas*, 509 F. App'x 54, 56
(2d Cir. 2013) (summary order).  Ascertaining whether the allegations establish a valid cause of
action is required in order to "ensure that the defaulting defendants received notice of the claims
against them and were provided an opportunity to answer those allegations."  *Johannes
Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 287
n.6 (E.D.N.Y. 2013).

Moreover, although a "default judgment entered on well-pleaded allegations in a
complaint establishes a defendant's liability," *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d
849, 854 (2d Cir. 1995) (internal quotation marks and citation omitted), it does not reach the
issue of damages, *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (summary order)
(citing *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 11 (2d Cir.
1997)).  A plaintiff must therefore substantiate its claim with evidence to prove the extent of
damages.  *See Trehan v. Von Tarkanyi*, 63 B.R. 1001, 1008 n.12 (S.D.N.Y. 1986) (plaintiff must
introduce evidence to prove damages suffered and the court will then determine whether the
relief flows from the facts) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).  While the
Court may hold a hearing to assess the amount of damages that should be awarded on a default,
*see* Fed. R. Civ. P. 55(b)(2) (court may conduct hearings on damages as necessary), the Second
Circuit has consistently held that "[b]y its terms, [Rule] 55(b)(2) leaves the decision of whether a
hearing is necessary to the discretion of the district court," *Fustok v. ContiCommodity Servs.,
Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); *accord Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d

Cir. 1993) (judges are given much discretion to determine whether an inquest need be held); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991) (Rule 55(b)(2) "allows but does not require . . . a hearing").

## B.       Subject Matter Jurisdiction

Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted).  A federal district court has original jurisdiction over a claim where "the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different states."  28 U.S.C. § 1332(a)(1).  The citizenship of an individual is determined based on the individual's domicile.  *See Palazzo ex. rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000).  A limited liability company has the citizenship of its members. *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000).  Where there is "any overlap among [the citizenship of] plaintiffs and defendants," subject matter jurisdiction is lacking.  *See Strother v. Harte*, 171 F. Supp. 2d 203, 205 (S.D.N.Y. 2001).

## C.       Breach of Contract

In order to prevail on a breach-of-contract claim under New York law, a plaintiff must establish four elements:  (1) the existence of a contract; (2) the plaintiff's performance of that contract; (3) the defendant's breach of that contract; and (4) that the plaintiff suffered damages as a result of the breach.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  It is a "fundamental principle" that an award of damages for breach of contract "should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (citation omitted).  The parties, however, also have the right to "specify within a contract the damages to be paid in the event of a breach . . . when the liquidated amount is a reasonable measure of the anticipated

probable harm, and the probable actual loss from a breach is difficult to estimate or ascertain at the time the contract is executed."  *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) (internal quotation marks and citations omitted).

New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract."  C.P.L.R. § 5001(a).  The applicable statutory interest rate in New York is nine percent per annum.  *See id.* § 5004.  Interest is "computed from the earliest ascertainable date the cause of action existed."  *Id.* § 5001(b).  This prejudgment interest accrues until "the date the verdict [is] rendered," and is then "included in the total sum awarded."  *Id*. § 5001(c).  Interest then continues to accrue on the "total sum awarded, including interest to verdict, report, or decision, . . . to the date of entry of final judgment."  *Id.* § 5002.

When the contract provides for an award of attorneys' fees to the prevailing party, "the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as the amounts are not unreasonable."  *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992).  In determining whether an attorney's hourly rate is reasonable, a court, "in exercising its considerable discretion, [must] bear in mind *all* of the case-specific variables" relevant to the reasonableness of attorneys' fees, as "[t]he reasonable hourly rate is the rate a paying client would be willing to pay."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).  Where a court awards fees pursuant to a valid contractual provision, "it has broad discretion in doing so, and an award of such fees may be set aside only for abuse of discretion."  *U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir. 2004) (internal quotation marks and citation omitted).

### D.     Breach of Guaranty Agreement

A guaranty "is an agreement to pay a debt owed by another," and "accrues only after

default on the part of the principal obligor."  *Midland Steel Warehouse Corp. v. Godinger Silver*

*Art Ltd.*, 714 N.Y.S.2d 466, 468 (1st Dep't 2000) (internal quotation marks and citations

omitted).  In order to enforce a guaranty, a plaintiff must establish (1) the existence of the

guaranty, (2) the underlying debt, and (3) the guarantor's failure to perform under the guaranty.

*Davimos v. Halle*, 826 N.Y.S.2d 61, 62 (1st Dep't 2006).  A guarantor is liable "only for the

amount of the principal obligor's default."  *Sweeters v. Hodges*, 683 N.Y.S.2d 9, 9 (1st Dep't

1998) (citation omitted).

### E.     Quasi-Contract Claims

New York law recognizes quasi-contract claims, including claims for unjust enrichment

(allowing the court to "infer the existence of an implied contract to prevent one person who has

obtained a benefit from another . . . from unjustly enriching himself at the other party's expense,"

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 905 (2d Cir. 1997) (internal quotation marks

and citation omitted; ellipsis in original)), or money had and received ("an obligation which the

law creates in the absence of agreement when one party possesses money that in equity and good

conscience he ought not to retain and that belongs to another," *Parsa v. State*, 64 N.Y.2d 143,

148 (1984)).  A plaintiff, however, may not recover on a quasi-contract claim where an

enforceable contract governs the subject matter of the claim.  *See Goldman v. Metro. Life Ins.*

*Co.*, 5 N.Y.3d 561, 572 (2005) ("[g]iven that the disputed terms and conditions fall entirely

within the insurance contract, there is no valid claim for unjust enrichment"); *Melcher v. Apollo*

*Med. Fund. Mgmt. LLC*, 959 N.Y.S.2d 133, 142 (1st Dep't 2013) (affirming dismissal of claim

for money had and received where enforceable contract governed the subject matter of the claim).

## II.     PLAINTIFF'S DAMAGES CLAIMS

### A.     Subject Matter Jurisdiction

With respect to the citizenship of the parties for purposes of diversity jurisdiction, the Complaint itself merely alleges (1) that none of Plaintiff's members is a Virginia citizen; and (2) that Crocker, Edgewood's "owner," is a Virginia resident.  (Compl. ¶¶ 2, 4, 5.)  These allegations, even if taken as true, are insufficient to establish the citizenship of *any* of the parties for purposes of diversity jurisdiction, rendering the Court unable to determine whether complete diversity exists.  With respect to Plaintiff, whose citizenship is based on the citizenship of its members, *see Handelsman*, 213 F.3d at 51-52, the Complaint fails to allege the citizenship of its members, noting only that none are Virginia citizens.  The Complaint also fails to allege the citizenship of Crocker, as it alleges only his residency, *see Palazzo*, 232 F.3d at 42, and further fails to allege the citizenship of Edgewood Group, as it does not allege the citizenship of any of its members (and indeed, it is unclear from the Complaint whether Edgewood has multiple members).  Plaintiff has filed similarly defective pleadings in several other cases filed in this district.  *See, e.g.*, *Merchant Cash & Capital LLC v. Solular, LLC*, No. 14cv7770 (AJN) (S.D.N.Y. Dec. 1, 2014) (directing Plaintiff to amend its complaint to allege the citizenship of each of its members and of the members of the limited liability company defendant); *Merchant Cash & Capital LLC v. Customized Serv. Enter. Corp.*, No. 14cv8661 (AT) (S.D.N.Y. Nov. 5, 2014) (directing Plaintiff to amend its complaint to allege the citizenship of each of its constituent persons or entities); *Merchant Cash & Capital LLC v. ENJ CA, Inc.*, No. 14cv8186 (VEC) (S.D.N.Y. Jan. 16, 2015) (directing Plaintiff to submit an affidavit stating where its members are domiciled).

As noted above, this Court, in order to satisfy its obligation to determine whether subject matter jurisdiction exists, *see Arbaugh*, 546 U.S. at 514, directed Plaintiff to show cause why this Court should not recommend that the Complaint be dismissed for lack of subject matter jurisdiction.  (Dkt. 20.)  Plaintiff, by declaration of counsel, has now alleged that its members are citizens of New York, Maryland, and Nevada; that Crocker is a citizen of Virginia; and that Crocker is Edgewood's sole member.  (Murray SMJ Decl. ¶¶ 3-5.)  These allegations, taken as true, establish complete diversity between the parties.  *See Handelsman*, 213 F.3d at 51-52.  Accordingly, this Court will turn to the substance of Plaintiff's damages claims.

### B.   Edgewood's Group's Breach of Contract

#### 1.   Edgewood Group's Liability

With respect to Plaintiff's claim against Edgewood Group for breach of contract, the well-pleaded allegations of the Complaint clearly establish three of the four elements of a breach-of-contract claim:  (1) the existence of an agreement (Compl. ¶ 9 ("[Plaintiff] entered into a sales agreement with [Edgewood Group] wherein [Edgewood] sold $163,726.00 of its business receivables/revenue to [Plaintiff]")); (2) performance by Plaintiff (*id.* ¶ 10 ("[Plaintiff] fulfilled its obligation . . . to provide the upfront sum of $115,300.00 as required by the Agreement")); and (4) damages (*id.* ¶¶ 11, 14 ("the unpaid sums bec[a]me due and payable to [Plaintiff]" in case of a breach, and, after the breach, Edgewood "[left] a balance . . . in the sum of $117,376.12")).  The question of whether the allegations in the Complaint establish Edgewood's breach (the third element of a contract claim) is less clear.

In this regard, the Complaint includes the following somewhat-cryptic allegations:

> 11.    During the course of the Agreement, the unpaid sums become due and payable to [Plaintiff], in full as required by [Plaintiff] or pursuant to the terms of the Agreement in the event of any action constituting a default or the breach of any covenants or

warranties contained in the Agreement.  Any outstanding balance owed by [Edgewood] at the time of default became immediately due and payable to [Plaintiff].

12.      [Edgewood] defaulted under the terms of the Agreement by breaching its representations and warranties to Plaintiff in direct violation of the Agreement.

13.      [Edgewood] has refused to make all payments due under the Agreement, despite due demand therefore.

(*Id.* ¶¶ 11-13.)  This recitation appears to allege that Edgewood breached some unspecified "representations and warranties," that, as a result, the "outstanding balance" owed by Edgewood became due,[7] and that Edgewood refused to pay this balance.  It does not, however, provide any information as to which "representations and warranties" were purportedly breached by Edgewood (resulting in the "balance" becoming "due"), and, indeed, Plaintiff has used identical boilerplate in complaints filed in several other actions in this district – each of which, presumably, involves different agreements and different facts.  *See, e.g.*, *Merchant Cash & Capital LLC v. Lawrence Albregts*, No. 14cv6965 (CM) (S.D.N.Y. filed Aug. 27, 2014); *Merchant Cash & Capital LLC v. Firehouse Entm't*, No. 14cv07010 (KPF) (S.D.N.Y. filed Aug. 28, 2014); *Merchant Cash & Capital L.L.C. v. Ecoster Inc.*, No. 14cv1758 (LTS) (S.D.N.Y. filed Mar. 14, 2014).[8]

Courts have found that a breach-of-contract complaint that does not identify the terms of the contract breached by the defendant, or the acts of the defendant constituting a breach, fails to

---

[7] These allegations again appear to contemplate a loan-like transaction, as it is unclear how a company's "future receivables" – which do not presently exist – could become "immediately due."  As noted above, however (*see* n.5, *supra*), this question involves factual issues not presently before the Court.

[8] Each of these actions resulted in a default judgment against out-of-state defendants who failed to appear.

state a claim for relief.  *See Fitzgerald v. Chase Home Fin., LLC*, No. 10cv4148 (CS), 2011 WL

9195046, at *6 (S.D.N.Y. Feb. 28, 2011) ("Plaintiffs fail to state a claim for breach of contract

because [p]laintiffs do not identify any terms of the mortgage agreement breached by

[d]efendants"); *Swan Media Group Inc. v. Staub*, 841 F. Supp. 2d 804, 808 (S.D.N.Y. 2012)

(dismissing complaint for failure to state a claim where complaint merely alleged that

"[d]efendant, by refusing to comply with its obligations, has breached the [a]greement" (citing

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)));

*Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013) (summary

order) (upholding dismissal of complaint for failure to state a breach-of-contract claim where

complaint alleged that defendant would pay a sales fee for making certain business introductions,

but "[did] not identify a single introduction for which [the plaintiff] [had] not been

compensated"); *see also Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (2d Dep't 2014) (finding that

the plaintiff's allegations were "too vague and indefinite" to state a claim in accordance with the

New York Civil Practice Law and Rules, and noting that a plaintiff's "allegations must identify

the provisions of the contract that were breached" (internal quotation marks and citations

omitted)).

On the other hand, "[c]ourts have generally recognized that relatively simple allegations

will suffice to plead a breach of contract claim even post-*Twombly and Iqbal*."  *Comfort Inn

Oceanside v. Hertz Corp.*, No. 11cv1534 (JG) (JMA), 2011 WL 5238658, at *7 (E.D.N.Y.

Nov. 1, 2011) (citing model forms of pleading and *Dobyns v. United States*, 91 Fed. Cl. 412, 430

(2010) (collecting authority)).  The model forms included in the appendix to the Federal Rules of

Civil Procedure, which "illustrate the simplicity and brevity that [the] rules contemplate," Fed.

R. Civ. P. 84,

> require little more than a statement that, for example, the defendant
> promised to pay a certain amount by a certain date and has not paid
> the amount by that date, or that the plaintiff tendered the purchase
> price and requested a conveyance . . . of land but the defendant
> refused to accept the money or make a conveyance,

*Comfort Inn*, 2011 WL 5238658, at *7 (internal citations and quotation marks omitted; ellipsis in

original).  In this case, although it is certainly not the most straightforward reading, the

Complaint can reasonably be read to allege simple nonpayment:  Edgewood sold its future

receivables to Plaintiff (Compl. ¶ 9), and Edgewood "refused to make all payments due" under

the Agreement (*id.* ¶ 13).  As a result, this Court cannot say that the Complaint provides

insufficient notice of the basis for Plaintiff's claim, particularly where, as here, Plaintiff's inquest

submissions confirm that the basis for its claim is, in fact, nonpayment – *i.e.*, that Edgewood

continues to operate its business, but refuses to make payments under the ACH Agreement.  This

Court therefore finds that Plaintiff's Complaint succeeds, if barely, in stating a breach-of-

contract claim upon which relief may be granted.

### 2.   Contractual Damages against Edgewood Group

As for damages, the Court looks beyond the Complaint itself, to the evidence submitted

by Plaintiff in connection with this inquest.  The Merchant Agreement provides that, if

Edgewood were to violate Section 3.1 (under which Edgewood agreed, *inter alia*, that it would

not "change the account name, password, or other access information" related to the designated

bank account; and that it would not "amend or terminate" any authorization to initiate automated

payments), then Plaintiff would be "entitled to, among other things, damages equal to the amount

by which the cash attributable to the Purchased Amount of future credit card receivables exceeds

the amount of cash received from the credit card receivables that have previously been

delivered."  (Merchant Agreement § 4.4.)  Plaintiff seeks the "liquidated amount" corresponding

to the balance of unpaid receivables (Murray Default Decl. ¶ 27), presumably in accordance with this provision.

As noted above, contracting parties are free to specify damages in advance "when the liquidated amount is a reasonable measure of the anticipated probable harm, and the probable actual loss from a breach is difficult to estimate or ascertain at the time the contract is executed." *Rattigan*, 739 F. Supp. at 169 (internal quotation marks and citations omitted). "If these two conditions are not met, the provision is deemed to operate as a penalty and is unenforceable as a matter of public policy." *Bell v. Ramirez*, No. 13cv7916 (PKC), 2014 WL 7178344, at *3 (S.D.N.Y. Dec. 9, 2014). The assertion that a liquidated damages provision is an unenforceable penalty is an affirmative defense, as to which the defendant bears the burden of proof, *id.*, and, even though this Court has some doubts as to the reasonableness of the provision at issue,[9] Defendants here have defaulted, resulting in a waiver of any such defense. Accordingly, this Court accepts Plaintiff's formulation of damages. As the Gallagher Declaration and the Payment Ledger establish that Plaintiff had collected $47,449.88 from Defendants at the time of Plaintiff's last submission, this Court concludes that Plaintiff is entitled to contractual damages in the amount of $116,276.12.[10]

---

[9] This Court notes that it is at least questionable whether this provision in fact represents a reasonable estimate of probable harm. Where a breach of a contract "involves the failure to deliver an asset, damages are determined by the difference between the contract price for the asset and the fair market value of the asset at the time of breach." *Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 923 N.Y.S.2d 482, 483 (1st Dep't 2011). As the Merchant Agreement involved a transfer of future receivables, and as Plaintiff alleges that Edgewood failed to deliver the purchased receivables, it would appear that the proper measure of damages would be the market value of those receivables at the time of breach. There is no evidence before the Court as to the market value of Edgewood Group's future receivables, but, given Plaintiff's purchase, just a month before Edgewood's default, of $163,726.00 of future receivables for $115,300.00, it seems likely that the fair market value was significantly less than the "cash attributable."

[10] $163,726.00 (purchased) - $47,449.88 (remitted) = $116,276.12 (balance due)

Plaintiff is also entitled to interest at the rate of nine percent per year from the date of the breach, August 6, 2013, to the date the default judgment was granted, July 31, 2014. This amounts to $10,292.83.[11]  Accordingly, this Court recommends Plaintiff be awarded an additional $10,292.83 in prejudgment interest.

### C.    Crocker's Guaranty

As noted above, in order to enforce a guaranty, a plaintiff must establish (1) the existence of the guaranty, (2) the underlying debt, and (3) the guarantor's failure to perform. *Davimos*, 826 N.Y.S.2d at 62. The allegations in the Complaint are sufficient to establish these elements, as the Complaint alleges that Crocker "made a written unconditional personal guarantee of [Edgewood's] performance" (Compl. ¶ 24), that Edgewood failed to perform, giving rise to a debt (*id.* ¶ 25), and that the balance remained unpaid (*id.* ¶ 26). Upon his own default, Crocker is therefore liable for the damages that may be assessed against Edgewood, *Sweeters*, 683 N.Y.S.2d at 9 – that is, for $116,276.12 in contractual damages and $10,292.83 in prejudgment interest.

### D.    Costs and Attorneys' Fees

Plaintiff has also sufficiently pleaded a claim for the costs and attorneys' fees incurred in prosecuting this action, by alleging that, under the Agreement, both Edgewood and Crocker agreed to pay any costs and attorneys' fees associated with Edgewood Group's breach. (Compl. ¶¶ 29-30.) As for costs, Plaintiff requests an award of $461.00 for (1) the $400.00 filing fee for initiating this action (as evidenced by a canceled check), (2) a $16.00 fee charged by a service that filed the Complaint (as evidenced by Plaintiff's counsel's ledger of expenses and

---

[11] $116,276.12 (principal) x .09 (rate) x 359/365 days per year (time) = $10,292.83 (interest)

Gallagher's and Murray's declarations), and (3) a $45.00 fee for service of the Complaint (as evidenced by an invoice). (*See* Murray Inquest Decl. ¶¶ 14-18.) This Court finds these costs to be reasonable, and recommends that Plaintiff be awarded the $461.00 in costs that it requests.

As for attorneys' fees. Plaintiff requests an award in the amount of $2,660.00. (Murray Default Decl. ¶ 28; Murray Inquest Decl. ¶¶ 19-29.) The attorney time records submitted by counsel[12] reflect a total of 15.1 hours of time spent on work performed by two attorneys associated with the law firm of Giuliano McDonnell & Perrone, LLP (the "Firm"). (*See generally* Murray Inquest Decl., Ex. E (attorney time records) (Dkt. 18-6).) These attorneys are identified as Arthur A. Castro ("Castro"), who is represented to be the senior associate on this matter, and Murray, represented to be the junior associate, each of whom billed his time at the rate of $200 per hour. (Murray Inquest Decl. ¶¶ 21, 23-24.) Plaintiff has voluntarily omitted any partner time from the submitted records. (*See id*. ¶ 25 (stating that, "[a]s this is a simple breach of contract matter in which the defendants have defaulted, all time performed by [the partner] was waived in order to mitigate the costs incurred by [Plaintiff] in pursuing the defendants").) Further, Plaintiff apparently seeks to recover for only 13.3 hours of the 15.1 hours of recorded time presented for the two associates (*see id*. ¶ 26) – seemingly covering time only through the completion of Plaintiff's motion for a default judgment, and an apparent estimate of the time that, at that point, was thought to have been needed thereafter.[13]

---

[12] Plaintiff's initial submission in connection with its motion for a default judgment did not contain attorney time records nor any information about the attorneys who worked on the case or their hourly rates. As noted above, this Court directed Plaintiff to supplement its submission, which it did by way of Murray's Inquest Declaration.

[13] In his Inquest Declaration, Murray somewhat confusingly states that, "[b]y the time [P]laintiff's motion for a default judgment was completed on July 23, 2014, 13.3 hours had been spent on this matter and $2,660.00 were incurred or necessarily would be incurred therefore." (*Id*. ¶ 26.) This Court notes that, as of the time Plaintiff submitted its motion for a default judgment in July 2014, the Firm had actually expended 10.1 hours of attorney time; thus, the

With respect to the reasonableness of the associate rates requested, Murray represents that the Firm's "standard billing rate for an associate attorney handling a Merchant Cash Advance industry contract matter[] is $250 per hour" (*id.* ¶ 20), but that "[d]ue to a retainer agreement with [Plaintiff], [Plaintiff] receives a discounted associate rate of $200.00 per hour" (*id.* ¶ 21).  Murray, who performed the majority of the work on the case, represents that he has "substantial experience" in the merchant cash advance industry, as well as "experience" managing merchant cash advance industry litigation.  (*Id.* ¶ 24.)  He also represents that Castro has "several years of experience in banking and financial industry litigation."  (*Id.* ¶ 23.) Although these descriptions lack detail, which is somewhat troubling in light of this Court's specific instruction to provide "[a] detailed explanation for the attorneys' fees claimed . . . [including] information regarding the level of relevant experience of each of the attorneys for whom fees are claimed" (Dkt. 17, at 2), this Court nonetheless recommends approval of the requested rate of $200 per hour, as it is a reasonable rate for associate attorneys performing the type of work involved in this case, *see Matteo v. Kohl's Dep't Stores, Inc.*, No. 09cv7830 (RJS), 2012 WL 5177491, at *3 (S.D.N.Y. Oct. 19, 2012) ("Courts in this district have held that civil attorneys in small firms litigating straightforward issues should generally receive between $200 and $375 per hour" (citations omitted)), *aff'd*, 533 F. App'x 1 (2d Cir. 2013); *Gulf Coast Bank & Trust Co. v. ASESD, LLC*, No. 11cv5023 (RMB) (RLE), 2014 WL 6850970, at *6 (S.D.N.Y. Aug. 29, 2014) (approving of rate of $250 per hour for associate with four years' experience), *report and recommendation adopted by* 2014 WL 6845410 (Dec. 4, 2014).

---

Court's best understanding of Murray's explanation is that the Firm estimated, at that time, that another 3.2 hours of time would be required, although it is not clear on what basis this estimate was made.

As to the reasonableness of the amount of time spent, Murray has submitted the Firm's contemporaneous billing records, beginning with the Firm's receipt of Edgewood Group's file, on May 8, 2014, through August 12, 2014.  (*See generally* Murray Inquest Decl., Ex. E.)  As noted above, the records reflect a total of 15.1 hours, including 9.8 hours of time spent by Murray and 5.3 hours of time spent by Castro, recorded in tenth-of-an-hour increments.  (*Id.*)  With the exception of entries for 2.3 hours, on July 22, 2014 (for beginning the preparation of the motion for a default judgment), and 1.6 hours on July 23, 2014 (for finishing the preparation of that motion), Murray's recorded time entries all range from .1 to .7 hours each, with the vast majority in the .1 to .3-hour range.  For the most part, these modest amounts of time appear reasonable, with the exception of time recorded for reviewing "emails" from the Court, at least some of which appear to refer to notifications from the Court's electronic case filing ("ECF") system.  (*See* Murray time entries for 6/13/14, 6/26/14, 7/22/14, 7/23/14, 8/4/14, and 8/12/14.)  Even where an attorney bills at the lowest possible increment for his billing system (*i.e.*, at .1 hour, or six minutes) for reviewing such an email, his time will necessarily be inflated, over the course of making several such entries.  For example, it simply should not take six-tenths of an hour, or 36 minutes, to review six such email notifications, which are typically single sentences.  Such an overstatement of hours would generally warrant a reduction in the fees awarded.  *See Barile v. Allied Interstate, Inc.*, No. 12cv916 (LAP) (DF), 2013 WL 795649, at *3 (S.D.N.Y. Jan. 30, 2013) (reduction is warranted for "[b]illing practices that tend to inflate the number of hours recorded," including "breaking out small tasks that take minimal time into separate entries"), *report and recommendation adopted by* 2013 WL 829189 (Mar. 4, 2013).

Castro's recorded time, which consists of only three time entries – .7 hours for reviewing default judgment documents, .4 hours for preparing for a hearing before the Court, and 4.2 hours

24

for supposedly attending that hearing (*see* Castro time entries for 7/22/14, 7/30/13, and 7/31/14) – also appears somewhat inflated.  In particular, this Court finds it difficult to believe that Judge Koeltl conducted a hearing in this case that lasted over four hours, where defendants had failed to appear.  This Court thus assumes that a significant amount of counsel's recorded time for that conference was spent in travel, which, in fee awards, is generally only compensated at 50 percent of the attorney's reasonable billing rate.  *Sulkowska v. City of New York*, 170 F. Supp. 2d 359, 369 (S.D.N.Y. 2001) (noting that courts in this district "customarily" apply a 50 percent reduction to hourly rates for travel time).  Here, where counsel apparently "block billed" his time for this particular entry, the Court cannot discern the portion of time that was spent in travel, and thus determine the amount by which the fee should be reduced.  Ordinarily, this would warrant at least a percentage reduction.  *See, e.g.*, *Hines v. City of Albany*, No. 14cv2299, 2015 WL 3479820, at *3 (2d Cir. June 3, 2015) (upholding 30 percent reduction for block-billed time entries).

The billing deficiencies that this Court has identified are, however, fairly minor, and the Court notes that, by seeking recovery for only 13.3 out of the 15.1 hours shown (and by eliminating any partner time whatsoever), Plaintiff is already proposing a voluntary reduction of all of the incurred fees of at least 12 percent.  Under these circumstances, this Court recommends that Plaintiff be awarded the $2,660 in attorneys' fees that it requests, plus the $461.00 in costs detailed above.[14]

---

[14] As Defendants' liability for costs and attorneys' fees arises out of their breach of the Agreement, these sums could be characterized as contractual damages, to which prejudgment interest at the rate of nine percent per year would apply as of the date the costs were incurred pursuant to C.P.L.R. § 5001.  *See, e.g.*, *4 B's Realty 1530 CR39, LLC v. Toscano*, 818 F. Supp. 2d 654, 658, 667 (S.D.N.Y. 2011) (awarding interest on attorneys' fees and costs).  Courts do not always award interest on attorneys' fees arising out of breach of contract, however, *see, e.g.*, *Customers Bank v. Anmi, Inc.*, No. 11cv7992 (AJN) (DF), 2014 WL 842577 (S.D.N.Y. Mar. 3,

### E.   Plaintiff's Quasi-Contract Claim

As noted above, the Complaint includes another cause of action against Edgewood Group, alleging that Edgewood "utilized" the funds provided by Plaintiff, that Edgewood failed to pay the balance it owed Plaintiff, and that, as a result, Edgewood is "indebted" to Plaintiff for that balance.  (Compl. ¶¶ 17-22.)  Although the precise nature of this cause of action is unclear, Plaintiff's allegations appear to assert a quasi-contract claim such as unjust enrichment or money had and received.  (*See* Section I(E), *supra*.)  As this Court recommends that damages be awarded on Plaintiff's contract claim, however, Plaintiff may not recover additional damages on a quasi-contract claim, *Goldman*, 5 N.Y.3d at 572; *Melcher*, 959 N.Y.S.2d at 142, nor does Plaintiff request any such award.  This Court therefore recommends that no damages be awarded with respect to the second cause of action identified in the Complaint.

---

2014) (adopting report and recommendation), and Plaintiff has not asked for such an award here (*see* Compl., at 5 (*ad damnum* clause); *see also* Murray Inquest Decl. ¶ 30).  As an award on default may not "differ in kind from, or exceed in amount, what is demanded in the pleadings," Fed. R. Civ. P. 54(c), this Court does not recommend that interest be awarded under C.P.L.R. § 5001 on the costs and attorneys' fees incurred by Plaintiff as a result of Defendants' breach of the Agreement.

## <u>CONCLUSION</u>

For all of the foregoing reasons, I respectfully recommend that Plaintiff be awarded

damages as follows, as a result of Defendants' default:

|  |  |  |
|---|---|---|
| 1. | Breach of Contract | $116,276.12 |
| 2. | Pre-Judgment Interest on Contract Damages | $10,292.83 |
| 3. | Costs | $461.00 |
| 4. | Attorneys' Fees | $2,660.00 |
|  | **Total:** | **$129,689.95** |

I also recommend that Plaintiff be awarded interest on this sum at the rate of nine percent per

annum running from July 31, 2014 (the date judgment was ordered by the Court), until the date

of entry of final judgment in accordance with C.P.L.R. § 5002.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

John G. Koeltl, United States Courthouse, 500 Pearl Street, Room 1030, New York, New York

10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 1660, New York, New York, 10007. Any requests for an extension of time for filing

objections must be directed to Judge Koeltl. FAILURE TO FILE OBJECTIONS WITHIN

FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

27

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      July 2, 2015

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. John G. Koeltl, U.S.D.J.

Counsel for Plaintiff (via ECF)

Edgewood Group, LLC
4906 Fitzhugh Avenue
Suite 104
Richmond, VA 23230

Mr. William Travis Crocker
3210 Edgewood Avenue
Richmond, VA 23222